IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JOHN ANDREWS, et al.,

            Plaintiffs,

     v.

GREGORY HOLLOWAY, a/k/a
GREG HOLLOWAY, et al.,

            Defendants.

Civil Action
No. 95-1047 (JBS)

**OPINION**

**APPEARANCES**

Michael A. Zindler, Esq.
TEICH GROH, PC
691 State Highway 33
Mercerville, NJ 08619-4492
    Counsel for all Judgment Plaintiffs except Louis Larsen

John F. Yaninek, Esq.
METTE, EVANS & WOODSIDE, ESQS.
3401 North Front Street
P.O. Box 5950
Harrisburg, PA 17110-0950
    Counsel for Judgment Plaintiff Louis Larsen

Robin J. Gray, Esq.
50 Kendall Drive
P.O. Box 4322
Reading, PA 19606
    Counsel for Judgment Defendant Gregory Holloway

**SIMANDLE, District Judge:**

The Court is presented with a motion by Judgment Plaintiffs'
("Plaintiffs") to hold Judgment Defendant Gregory Holloway
("Defendant") in contempt of Court pursuant to Rule 37(b), Fed.
R. Civ. P. [Docket Item 538].  For almost twelve years, Defendant

has successfully avoided paying a judgment owed to Plaintiffs by obstructing Plaintiffs' efforts to obtain, through discovery, information about his financial affairs.  Defendant's conduct culminated in this Court's final discovery order of March 5, 2008, in which the Court gave him a final mandate to provide the financial information he has long obscured, permitting the Plaintiffs to obtain his further deposition testimony upon a long list of relevant topics.  The Court finds, for the reasons described below, that Defendant's deliberately evasive and untruthful answers in response to the Court-ordered questioning were contemptuous of this Court's Order and warrant his incarceration for civil contempt until that contempt is purged.

I.   **BACKGROUND**

> These proceedings have a long and inglorious history, consuming much time, energy, and expense on the part of the parties and necessitating court intervention for the mundane (where particular depositions should be conducted) as well as the trivial (when depositions should end in the evening).

Andrews v. Holloway, No. 95-1047, 1996 WL 495148, at *4 (D.N.J. Aug. 27, 1996) [hereinafter Holloway II].

The present action, long in its post-judgment phase, has now passed its fourteenth birthday.  It has been over twelve years since the Court lamented the Herculean efforts expended in this litigation, and as of this date it remains, for all practical purposes, unresolved.  Plaintiffs are twenty-seven individuals

who invested millions of dollars in a limited partnership, Continental Rare Coin Fund I, Ltd. ("CRCF I"), in response to a 1988 prospectus issued by Defendant, who was the sole shareholder of CRCF I and served as the firm's investment advisor.  In 1995, after learning that the partnership had no value, Plaintiffs brought suit against Defendant, along with several others entangled with CRCF I, including his wife, Laura Andre, and his parents.[1]  Plaintiffs asserted claims under the Racketeering Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, as well as common law claims of fraud.  On June 20, 1997, as part of a settlement, Defendant agreed to an entry of judgment against him, in the amount of $6,097,015.00 [Docket Item 371].

To date, Defendant has paid no part of this judgment, which now amounts to over nine million dollars.  (Pls. Joint Certification ("Joint Cert.") ¶¶ 1-2.)  In fact, he testified that when he agreed to the entry of this judgment he did not intend to pay any of it.  (Pls. Ex. B, June 13, 2008 Dep. at 27.) Apparently to that end, he has maintained throughout his post-judgment depositions that he is unemployed, and has no income, assets, bank accounts, or credit cards in his name.  (Pls. Ex. L,

---

[1] For further detail regarding the charges and conduct at issue in the civil suit, the Court references its opinion granting Plaintiffs a preliminary injunction restraining Defendant "from transferring, selling, hypothecating or encumbering any real or personal property of any type."  Andrews v. Holloway, No. 95-1047, 1995 WL 875883 (D.N.J. Nov. 9, 1995) [hereinafter Holloway I].

May 28, 2008 Dep. at 7, 14, 25-26, 31, 53-55.)  Instead, he
claims that he has been and continues to be supported by his wife
and his parents, Lee and Carlayne Holloway.  (Pls. Ex. N, June
22, 2008 Dep. at 35.)  It is Plaintiffs' theory that Defendant
has fraudulently transferred or concealed assets with the help of
his wife and parents and that their assets are, in fact,
Defendant's assets, and that he has maintained a lavish lifestyle
in Palm Beach, Florida and Ocean City, New Jersey that cannot be
explained through his elliptical testimony.

Plaintiffs' efforts to procure payment from Defendant have
resulted in many Court orders over the years, due in large part
to Defendant's and his family's[2] resistance to post-judgment
discovery.  Defendant has repeatedly made clear that he would not
appear for depositions without a specific Court order.  As early
as September, 2003, this Court found that Defendant "was
unresponsive [during depositions] to most questions about his
financial dealings with [his wife] Ms. Andre" for he "continually
refused to answer questions about Ms. Andre's wealth or claimed
that he did not know or was unable to remember anything pertinent

---

[2] On September 29, 2003, the Court was forced to hold
Defendant's wife, Ms. Andre, in contempt also for failing to
comply with a Court Order governing discovery.  Andrews v.
Holloway, No. 95-1047, 2003 U.S. Dist. LEXIS 16961 (D.N.J. Sept.
29, 2003).

4

about Ms. Andre's financial dealings."[3]  Andrews v. Holloway, No. 95-1047, 2003 U.S. Dist. LEXIS 16961, at *16 (D.N.J. Sept. 29, 2003) [hereinafter Holloway III].  On this basis, the Court permitted broad questioning of Ms. Andre, but still unable to obtain the necessary information from her, Plaintiffs continued to seek answers from Defendant.

A series of discovery disputes and delay by Defendant led to this Court's most recent, and final, discovery order.[4]  On

---

[3] The Court further observed:

> [Defendant's] deposition revealed, though, that Ms. Andre has had resources to invest in multi-million dollar real estate since 1997 and has, along with Mr. Holloway's parents, paid all the living expenses of the family. Mr. Holloway testified Ms. Andre had "a substantial net worth" of "several million at least" in the late 1990s, [] but could not identify the source of her wealth and "refused to answer any questions about Laura Andre's employment, job history, income, assets, anything. Period." [] The Court had been led to believe that she was independently wealthy because of prior wealth from a previous marriage, but plaintiffs recently found that she had only received a 1986 Jeep Cherokee and some jewelry from the 1993 divorce settlement. [] Deposition also revealed that Mr. Holloway himself, who testified that he had no assets by the time of his marriage to Ms. Andre, []once had "millions of dollars,"[]. He provided no clear reason for their sudden disappearance in the late 1990s.

Holloway III, 2003 U.S. Dist. LEXIS 16961, at *16-17 (internal citations omitted).

[4] On March 22, 2006, the Court denied Defendant's motion to quash Plaintiffs' subpoena and ordered Defendant to appear for a deposition, ultimately scheduled for June 20, 2006.  Defendant attended that deposition, though he arrived almost an hour late

December 27, 2007, after Defendant unilaterally cancelled a
scheduled deposition, Plaintiffs filed a motion for Writ of
Capias Ad Satisaciendum and asked the Court to order Defendant's
arrest and incarceration until he provided full and complete
testimony as to the true nature and extent of his assets.  Rather
than grant Plaintiffs' motion, the Court provided Defendant with
a final opportunity to avoid custody and entered the Order in
question.  This Court's Order of March 5, 2008, required
Defendant to appear "to be deposed under oath for an undetermined
period of time to allow the Judgment Plaintiffs' attorneys to
conduct the deposition of the Judgment Defendant concerning all
of the assets, individuals and entities that are set forth on
Schedule 'A' which is attached hereto and ma[d]e a part hereof."[5]

---

and continued to be unresponsive, claiming to "know nothing"
about what his wife does and refusing to answer questions about
the settlement agreement in another action.  (Pls. Ex. F, June
20, 2006 Dep. at 4, 16, 17-20.)  At the end of that day,
Magistrate Judge Rosen ordered Defendant to notify Plaintiffs of
a date he would be available for four more hours of deposition.
(Id. at 198-99.)  Almost a month went by and Defendant had not
yet provided parties with a date, and so Plaintiffs' counsel
wrote him requesting this information.  (Pls. Ex. G.)  In
response, Defendant said he would be available on November 20,
2006 and so a deposition was scheduled for that date.  On
November 17, 2006, Defendant cancelled the deposition.  (Pls.
Exs. H & J.)  He had this to say: "I have been informed that
Judge Rosen has left the bench.  Until the court makes it clear
who is going to mediate and resolve the issue of disputed
questions, I will not appear.  This deposition is cancelled.  I
trust you have an enjoyable day in Camden."  (Pls. Ex. J.)

   [5] Schedule A is a list of seventy areas of questioning about
Greg Holloway's financial assets, liabilities, and endeavors,
including "[a]ll transactions with Carl Norton," "[a]ll

The Court specifically ordered Defendant to "provide testimony concerning the income and assets of his wife, Laura Andre and his mother, Carlayne Holloway" and further to "produce all books, records and documents that the Judgement Plaintiffs shall request of him."  This Order mandated his obligation to give truthful and complete answers to all relevant questions within the seventy subjects defined in Schedule A, and to produce all documents relevant to those subjects that Plaintiffs request.

Defendant appeared for four days of depositions, on May 28, 2008, May 29, 2008, June 12, 2008, and June 13, 2008.  He did not appear on May 27, 2008, the first scheduled day of depositions. During his depositions he gave answers to many questions, except for those he claimed were duplicative, but many of his answers were that he did not know or could not remember the information requested from him.  He further produced just two documents, his 1998 and 1999 joint tax returns, claiming he doesn't have any additional requested documents, though they may exist.  Further, though parties agreed to continue depositions on June 18, 2008, Defendant refused to attend.

In response to Defendant's conduct during post-judgment discovery, Plaintiffs brought the present motion to hold

transactions with Laura Andre" and "[a]ll transactions with Carlayne Holloway."

Defendant in contempt.[6]  On February 25, 2009, the Court convened the hearing upon its order to show cause why Mr. Holloway should not be held in contempt of Court,[7] heard argument, and reserved decision.

## III. DISCUSSION

### A.  Contempt

Disobedience of a court order compelling a deponent to appear at a deposition and answer relevant questions is indeed a serious matter.  Rule 37(b)(1), Fed. R. Civ. P., makes this crystal-clear, providing:

> If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court.

Civil contempt is a means by which the Court may, if necessary, ensure that its discovery orders are obeyed.  Fed. R.

---

[6] This is not, unfortunately, the first time this Court has been confronted by Defendant's "numerous instances of contemptuous conduct." Andrews v. Holloway, No. 95-1047, 1996 WL 495148, at *4 (D.N.J. Aug. 27, 1996).  On August 27, 1996, the Court held Defendant in contempt of two Court Orders, finding that "what has become plainly evident on the basis of the evidence and testimony is the patently irregular manner in which [Defendant] and those associated with him conduct their business dealings and the failure of this court's previous Orders to impose any degree of regularity upon those dealings." Id. at *2.

[7] Mr. Holloway waived his rights to attend the hearing and to testify at the hearing, according to his attorney, Robin J. Gray, Esq., who appeared on his behalf.  Ms. Gray, only recently retained by Holloway (she stated her fees are being paid by Carlayne Holloway) was unable to address many of the questions about her client's conduct, as she had not represented him at the depositions.

Civ. P. 37(b)(1) & (b)(2)(A)(vii).  "It vindicate[s] the District Court's authority over a recalcitrant litigant."  Hutto v. Finney, 436 U.S. 678, 691 (1978).  "[C]ivil contempt may be employed to coerce the defendant into compliance with the court's order and to compensate for losses sustained by the disobedience."[8]  McDonald's Corp. v. Victory Investments, 727 F.2d 82, 87 (3d Cir. 1984).

The Court will not lightly hold a party in contempt, especially where, as here, the consequence may be civil commitment.  A plaintiff seeking a contempt order must show by clear and convincing evidence: (1) that a valid court order existed; (2) that defendant had knowledge of the order; and (3) that defendant disobeyed the order.  Roe v. Operation Rescue, 919 F.2d 857, 871 (3d Cir. 1990).  Further, a "court should not hold a party in contempt: 'where there is ground to doubt the wrongfulness of the respondent's conduct.'"  A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc., 134 F. Supp. 2d 668, 670 (E.D. Pa. 2001) (quoting Littlejohn v. Bic Corp., 851 F.2d

---

[8] Contrary to Defendant's suggestion, the contempt at issue here is not criminal, but civil.  "To determine whether a contempt order is civil or criminal, Supreme Court jurisprudence requires an examination of the 'character and purpose' of the sanction imposed."  Chadwick v. Janecka, 312 F.3d 597, 607 (3d Cir. 2002).  Here, as the subsequent opinion will make clear, the Court is imposing as a remedial, not punitive, measure, and intends to hold Defendant in contempt (and in custody) until he purges his contempt by complying with the Court's March 5, 2008 Order.  All of these factors make this Court's opinion and order one for civil, and not criminal, contempt.  Id. at 607-08.

673, 683-84 (3d Cir. 1988)).  Any ambiguities in the order will be resolved in favor of the party charged with contempt.  Harris v. City of Philadelphia, 47 F.3d 1311, 1326 (3d Cir. 1995).

There is no dispute that the Court's March 5, 2008 Order was valid, nor is there doubt that Defendant had knowledge of that order.  Defendant has identified no ambiguities in that Order.  Thus, the sole issue is whether Defendant, who did appear for depositions and answer questions, disobeyed the March 5th Order.  Plaintiffs provide the Court myriad of examples of Defendant's misconduct during the Court-ordered depositions, arguing that he was unresponsive by providing incredible answers to questions, declaring he cannot remember or does not know basic information about his wife and his own financial history, and insisting that he has none of the documents requested of him.  In essence, Plaintiffs argue that Defendant should be held in contempt because he is intentionally evasive, and thus is non-responsive to the Court's Order that he provide testimony under oath.

The question then becomes whether a party who attends a deposition and answers questions as mandated by a court order can be held in contempt of that order if his answers are misleading and evasive.  The Court finds that he can and, in fact, that he must.  The purpose of a deposition is to enable a party to obtain truthful and complete information about relevant topics.  Truthfulness is demanded through the requirement that the

deponent testify under oath or affirmation, Rule 30(b)(5)(A)(iv), Fed. R. Civ. P., and completeness is required through the provisions of Rule 37(a)(4), Fed. R. Civ. P., that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond."

In light of the purpose of depositions, "a response containing misrepresentations . . . is as good as no response at all." Manville Sales Corp. v. Paramount Sys. Inc., No. 86-4157, 1988 U.S. Dist. LEXIS 14225, at *7-8 (E.D. Pa. Dec. 16, 1988) (quoting Fautek v. Montgomery Ward & Co., Inc., 96 F.R.D. 141, 154 n.5 (N.D. Ill. 1982)) (holding that untruthful responses to written interrogatories warrant sanction under Rule 37(d), Fed. R. Civ. P., for failure to serve answers to interrogatories); see Fed. R. Civ. P. 27(a)(4) ("For purposes of [a motion for an order compelling disclosure or discovery], an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.")  Thus, the Court concludes that a witness who gives untruthful answers at a deposition ordered by the Court, he may be held in contempt of that order for he is being, in effect, unresponsive.  Nat'l Grange Mut. Ins. Co. V. Sharp Equip. Co., No. 01-0628, 2002 U.S. Dist. LEXIS 4096, at *17-22 (E.D. Pa. Mar. 1, 2002) (finding evasive and untruthful answers to questions plaintiff was ordered to answer justified finding of contempt under Rule 37(b)(2) and dismissal of action);

see Black Horse Lane Ass'n v. Dow Chem. Corp., 228 F.3d 275, 299-305 (3d Cir. 2000).

The Court finds support in the Third Circuit's opinion in Black Horse, in which the appeals court held that "when a witness is designated by a corporate party to speak on its behalf pursuant to Rule 30(b)(6)[, Fed. R. Civ. P.], 'producing an unprepared witness is tantamount to a failure to appear' that is sanctionable under Rule 37(d)." 228 F.3d at 304. The Third Circuit went on to find that the Rule 30(b)(6) witness at issue was so "uncooperative" and "unhelpful" that his testimony was tantamount to failing to appear, where he claimed to know nothing about, or have no recollection of, conduct of his own corporation and agreements he signed. Id. at 304-05. Similarly, appearing for a deposition but providing false or misleading answers is uncooperative and unhelpful and may be tantamount to a failure to appear at a court-ordered deposition. See id. at 304-05.

Having concluded that the giving of false or evasive answers in response to court-ordered questioning constitutes contempt, the Court must now determine whether there is clear and convincing evidence that Defendant's responses to deposition questioning were knowingly false or intentionally unresponsive such that he violated the Court's March 5th Order to appear at depositions and answer questions on a wide range of financial subjects. The Court finds, and will address at length below,

12

that there is clear and convincing evidence that Defendant is being deliberately unresponsive and misleading as to his source of financial support, his lack of knowledge as to his wife's finances and employment, his claim that he has never done business with a Carl Norton, and his insistence that he has absolutely no knowledge of any relevant financial documents beyond the joint tax returns for 1998 and 1999.  The Court further finds Defendant in contempt for unilaterally, and without seeking a modification of the Court Order, ending depositions after June 13, 2008.[9]

---

[9] Plaintiffs point to numerous other areas where they argue Defendant has been contemptuous.  The Court finds, however, that they have not presented clear and convincing evidence that such conduct violated the Court's March 5th Order.  For example, though somewhat unlikely, the Court cannot conclude that there is clear and convincing evidence Defendant was dishonest when describing his mother's transactions with Larry Leneve or when he indicated he has only a vague understanding of how she accumulated her supposed wealth, and similarly the Court finds no evidence to undermine Defendant's claim that he did not keep copies of proposals Mr. Leneve made for him and his family.  (Joint Cert. ¶¶ 55-57; Pls. Ex. L, May 28, 2008 Dep. at 35-38; Pls. Ex. M., May 29, 2008 Dep. at 59-61.)  Likewise, though the e-mail from Gary Ross accusing Defendant of criminal conduct and claiming that Mr. Ross hide 1.6 million dollars for Defendant is highly suspicious, the Court does not find Defendant's explanation -- that Mr. Ross is lying and that Defendant did wire the money to Mr. Ross in 1993 or 1994 but for the purpose of Mr. Ross placing the money in a bank account in exchange for that bank granting Defendant five million dollar line of credit -- so inherently implausible as to be clear and convincing evidence that Defendant is lying.  (Joint Cert. ¶¶ 87-89; Pls. Ex. M, May 29, 2008 Dep. at 11-15; Pls. Ex. M, attachment H-7.)  Similarly, Defendant does provide an explanation for his wife's business transaction with Mr. Ross in February, 2007 -- he stated that Mr. Ross was going to give her an interest in property as a means of paying back a debt Mr. Ross owed Ms. Andre -- and though

### 1.   <u>Testimony as to Source of Financial Support</u>

The Court's March 5, 2008 Order requires Defendant testify not only about his own assets, but also the income and assets of his wife, Laura Andre, and his mother, Carlayne Holloway, and consequently to provide truthful testimony as to his source of financial support.  It is difficult to piece together Defendant's testimony on who was supporting him when -- in part because Defendant claims not to remember these important facts in his own life.  Nevertheless, it is possible to create a broad time-line.  Defendant says that he has not had any money since 1994.  (Joint Cert. ¶ 44.)  Until his marriage to Ms. Andre in 1999, he claims his parents, and in particular his mother, supported him.  (Pls. Ex. N, June 12, 2008 Dep. at 34-35.)  Since marriage, he claims his wife has supported him, except possibly for some unknown period of time when he was in California.  (<u>Id.</u>)  According to Defendant, from the "early to mid '90s through to 2000," Defendant's mother lent Ms. Andre one million dollars.  (Pls. Ex. L, May 28, 2008 Dep. at 109-10.)  He reveals no details of this supposed loan, such as the terms of repayment, the note documenting the loan, or its receipt or expenditure of proceeds.

---

Plaintiffs doubt this explanation, his response does not violate this Court's Order.  The Court acknowledges Plaintiffs' frustration with Defendant and the difficulty of showing contempt where Defendant persists in providing dubious testimony, but Plaintiffs must still meet their burden and they have not done so on the above mentioned points by clear and convincing evidence to impeach or undermine Mr. Holloway's testimony.

Until several years ago his mother occasionally lent more money to Ms. Andre and Defendant, but he doesn't "remember when it started and stopped." (Id. at 23.) Ms. Andre has never worked full time and Defendant does not know if she's ever been unemployed. (Id. at 112.) As far as Defendant knows, she has worked continually from 2000 to the present. (Id. at 24.) She is currently a self-employed botanist making approximately $60,000 to $80,000 a year, along with some unknown rental income. (Id. at 15.) In addition to taking care of all the bills and supporting their four children, ages four, six, eighteen, and twenty,[10] Ms. Andre has paid back "quite a bit" of the one million dollar loan from her mother-in-law. (Id. at 18-19, 26, 113.) Defendant explained: "All I know is everything is [] taken care of and I don't pay any attention to it." (Id.) He frankly pretended to be unaware of how this was even possible, feigning ignorance of a million-dollar transaction between his own partly-employed wife and his own retired mother.

Defendant says he remains unemployed because he is the primary care-giver for his two youngest children. (Id. at 26.) It is unclear why he did not work before the birth of his six year-old. When asked, he responded: "Because I can't give you a

---

[10] Defendant testified that the two older girls have jobs providing surfing lessons and babysitting and buy their own food, but make no further contributions to the family expenses. (Id. at 19).

good answer.  I don't know." (Id.)

Defendant's testimony as to his means of financial support is contradicted by sworn statements from both his parents and his wife, as well as his own statement.  From November, 1996 until August, 1998, Defendant's parents (who were co-defendants in this lawsuit) wrote a series of letters to this Court and the Third Circuit declaring their financial distress.  (Pls. Ex. O.)  In December, 1996, they wrote: "Our financial picture, never good, is now very precarious, bordering on disastrous." (Id.) According to his parents, "If the [C]ourt refuses to move our case to Alexandria, we will be force[d] to accept a judgment, allow our home to be foreclosed and seek bankruptcy to save our furnishings." (Id.)  In March, 1997, they wrote:

> Carlayne Holloway is substitute teaching nearly every day, but there is no certainty how long or how often work is available.  At age 72, she is under great stress from her work.  Lee Holloway has applied for several jobs, but at 76 is so far unsuccessful.  Of course, we are both under great stress from this false and unjustified suit.  Our financial advisor or supposed financial advisor has control of the last big amount of money we ever had.  Although he promises the $237,000 plus interest will be returned by 4/30/97, he has also promised since 10/96 to obtain a personal loan to help us with our monthly bills, Visa debt & back taxes; & promises to call back, but never does.

(Id.)  That same month, his parents wrote to the Third Circuit complaining of this Court's denial of their application to proceed in forma pauperis in light of their "poverty." (Id.)  As late as August, 1998, they wrote to this Court explaining they

16

had "no liquid assets and [were] financially unable to borrow."
(Id.)  All this occurred right in the middle of the period in
which (according to Defendant) Defendant's mother was supposedly
lending Laura Andre one million dollars.[11]  (Pls. Ex. L, May 28,
2008 Dep. at 109-10.)  His parents could not have supplied a loan
of one million dollars, nor of any meaningful sum, during that
period of time.  Furthermore, neither Defendant Holloway nor
Laura Andre have produced any document memorializing this loan,
the disposition of the loan, or its repayment.  This million-
dollar asset of the Holloway household is especially relevant to
Plaintiffs' post-judgment inquiry, since these proceeds appear to
have existed after Plaintiffs obtained their six-million dollar
judgment in 1997.

Similarly, Laura Andre has presented similar evidence of her
utter financial distress.  (Pls. Ex. Q, Dec. 10, 2003 Dep. at 5,
39; Pls. Ex. P.)  In December, 2003, Ms. Andre testified that she
did not have "any money."  (Pls. Ex. Q, Dec. 10, 2003 Dep. at 5.)
She further testified that she was unemployed, without an income,
and had been without an income for at least a year.  (Id. at 39.)
In February, 2004, Ms. Andre submitted the following
certification to the Court:

---

[11] Defendant's post-hoc explanation, through counsel, that
his mother was only temporarily financially distressed, does not
explain how she supported him through the years of her "poverty."

17

1.   My in-laws told me emphatically several months
     ago that they would not be paying any more of
     my household bills.
2.   My in-laws have not paid any of my household
     bills during the last two months.
3.   I do not know the present location of my in-
     laws and have no way to reach them.
4.   I doubt my in-laws would agree to pay any
     portion of the attorney's fees and costs the
     Court has ordered me to pay.
5.   I have no income at this time.

(Pls. Ex. P.)  This is contrary to Defendant's testimony that Ms.

Andre has supported him since their marriage in 1999, (Pls. Ex.

N, June 12, 2008 Dep. at 34-35), and that she has worked

continuously since 2000, (Pls. Ex. L, May 28, 2008 Dep. at 24),

and that she has somehow managed to repay the million-dollar loan

that was made to her, rather than to her husband, by a mother-in-

law who has at least twice sworn that she had no real assets and

was on the verge of bankruptcy.  Mr. Holloway's testimony about

his wife's financial contributions is knowingly false.

The Court finds that this evidence, in light of Defendant's

exceedingly vague and implausible testimony, is clear and

convincing evidence that Defendant is being intentionally evasive

in testimony as to his means of support for the past fifteen

years.

Defendant will be held in contempt of the Court's March 5,

2008 Order until he provides complete, truthful testimony as to

his means of support from 1997 to the present date.

2.   <u>Knowledge of Ms. Andre's Finances and Employment</u>

As previously addressed, the Court's March 5th Order expressly requires Defendant to "provide testimony concerning the income and assets of his wife, Laura Andre . . . ."  Defendant has been married to Laura Andre since 1999 and they are raising four children together.  (Pls. Ex. N, June 12, 2008 Dep. at 35.) For at least two years they filed joint tax returns together. (Pls. Ex. L, attachment H-3.)  As discussed above, Defendant claims that his wife is his main source of financial support. (Pls. Ex. N, June 12, 2008 Dep. at 34-35.)  Nevertheless, he states that he does not know "anything" about what she does, beyond that she is a part-time botanist with a salary between $60,000 and $80,000 per year.  (Pls. Ex. L, May 28, 2008 Dep. at 55-56.)  He says he does not know what her income has been for any year between 2000 and 2007.  (<u>Id.</u> at 29-30.)  He had "no idea" what the source of a capital gain of $854,000 and business income of $301,285, reported on their joint tax return for 1999 might have been, claiming only that it was possibly the product of his wife's real estate transaction.  (<u>Id.</u> at 79, 82-83, attachment H-3.)  He claims not to know what she did with $1 million dollars she earned from a property sale in 2002.  (<u>Id.</u> at 85-86.)

The Court finds his supposed ignorance as to these basic issues –- the very income on which he relies, how his wife of

19

almost ten years spends her days, where tremendous sums of money came from and went -- is simply unbelievable.  Mr. Holloway has overplayed his hand by professing ignorance of these fundamental financial facts, all of which involve the basics of his, and his family's, financial existence, at a time when he is doing everything possible to avoid paying any part of the six million-dollar judgment in this fraud case.  The Court finds that Defendant's responses to these questions were evasive and there is clear and convincing evidence that he is being untruthful, and thus a finding of contempt is appropriate and necessary for his failure to provide complete and honest answers to questions about his wife's financial situation.[12]

### 3.  Business with Carl Norton

In addition to testimony concerning his own assets and those of his wife and mother, Defendant was also required under the Court's March 5th Order to provide testimony regarding "[a]ll transactions with Carl Norton."  Defendant testified that he "introduced [Carl Norton] to people that he's done business [with], but I did never did [business with him]."  (Id. at 115.) Plaintiffs have presented evidence, however, that shows Defendant

---

[12] Defendant's assertion of a spousal communications privilege plays no part in this Court's finding of his evasiveness regarding his wife's financial situation.  The contours of this privilege are set forth for the guidance of all parties in Part III.B, below.

was far more involved with Mr. Norton that his testimony suggests.  Plaintiffs first offer a December 1, 2006 e-mail from Gary Ross to the e-mail address MARIPOSA12@aol.com, the address Mr. Ross later directs his angry e-mail to Defendant.  (Pls. Ex. L, attachment H-6; Pls. Ex. M, attachment H-7.)  The December e-mail describes a business venture arranged by Mr. Norton and asks the recipient to join in the venture.  (Pls. Ex. L, attachment H-6.)  The second document is one which Defendant admitted is in his handwriting, with the heading "Wires to U.S.," and lists various amounts of money and their ultimate destinations, including Defendant's nephew.  (Pls. Ex. M, May 29, 2008 Dep. at 26-27, attachment H-8.)  Defendant admits that the money at issue in this document came from Mr. Norton.  (Pls. Ex. M, May 29, 2008 Dep. at 28.)  Defendant attempted to explain these two documents away, stating that his family never took Mr. Ross up on the offer to join Mr. Norton's venture, and that his note about wiring money was done after the fact, as some form of accounting for what had already occurred.  (Pls. Ex. L, May 28, 2008 Dep. at 121; Pls. Ex. M, May 29, 2008 Dep. at 26.)  The Court finds, however, that these two documents provide clear and convincing evidence that Defendant's testimony regarding his business relationship with Mr. Norton was, at best, incomplete, and at worst, dishonest, and therefore will find him in contempt of the Court's Order that he provide testimony as to all transactions

with Mr. Norton.

### 4.   Existence of Relevant Documents

The March 5th Order required Defendant to "produce all
books, records and documents that the Judgment Plaintiffs shall
request of him."  Yet Defendant has produced only two documents -
his 1998 and 1999 joint tax returns.  (Pls. Ex. L, attachment H-
3.)  Defendant claims these are "all the documents" he has.
(Pls. Ex. L, May 28, 2008 Dep. at 27, attachment H-3.)  The Court
finds this to be incredible.  Throughout the lengthy depositions
at issue here, Defendant repeatedly references family business
transactions, for which he would have the Court believe there is
absolutely no documentation.  He further asks the Court to
believe that he has no personal financial records whatsoever.
Plaintiffs, on their own, have been able find the following,
highly relevant, documents:

- An e-mail from Gary Ross to MARIPOSA12@aol.com dated
  December 1, 2006, and describing a business venture with
  Carl Norton (Pls. Ex. L, attachment H-6)
- An email from Gary Ross to MARIPOSA12@aol.com dated July
  27, 2007, accusing Defendant of stealing money (Pls. Ex.
  M, attachment H-7)
- A statement of unanimous written consent to action taken
  in lieu of the annual meeting of the Directors of Premier
  Development Incorporated, of which Defendant's wife,
  Laura Andre, was a voting stockholder (Pls. Ex. L,
  attachment H-4)
- A handwritten note by Defendant documenting wire
  transfers of money in 2006 (Pls. Ex. M, attachment H-8)

In light of these highly relevant documents that Plaintiffs have
been able to obtain on their own, the Court finds that

22

Defendant's testimony that he has absolutely nothing beyond those two joint tax return is dishonest and thus contemptuous of the Court's Order that he produce all documents and records requested by Plaintiffs.[13]

_____

[13] There are some documents, such as papers related to the San Lee litigation, which Defendant believes may exist and knows where they might be - with his attorney - but has made no effort to procure them. (Pls. Ex. N, June 12, 2008 Dep. at 81.) As an explanation, he stated that he thought he was only obligated to provide things within his possession. (Id. at 81-82.) The Court's Order reads: "Judgement Defendant, Gregory H. Holloway, shall produce all books, records and documents that Judgment Plaintiffs shall request of him." It is not clear from this language what efforts, if any, Defendant was required to mount to obtain documents he did not possess. There must be some limit -- Plaintiffs could not demand, for example, that Defendant illegally procure documents that he has no right to access. Therefore, where there is ambiguity as to the scope of the order in determining whether to hold Defendant in contempt, this ambiguity must be resolved in favor of Defendant. Harris, 47 F.3d 1311 at 1326. The Court will decline to find his failure to provide documents he did not physically possess to be contemptuous, but will enter an order requiring Defendant to produce all documents which are in his possession, custody, or control, including documents held by his lawyer and his family. Fed. R. Civ. P. 34(a), 37(a), 69(a). For example, if Plaintiffs seek relevant documents from Gregory Holloway that are in his control (because he himself would have a right to access the documents or obtain copies of them), but which are in the possession of others (such as a financial institution, attorney, business associate, spouse, parent, child, or other relative), then Gregory Holloway has the obligation to (a) truthfully indicate the existence of such documents, (b) truthfully indicate where the documents may be found, and (c) authorize Plaintiffs to obtain the documents from such source by executing a suitable written authorization for release of such documents on a form supplied by Plaintiffs' counsel for such purpose.

5.   <u>Unilateral Cancellation of Depositions</u>

The Court finds that Defendant's unilateral cancellation of depositions is contemptuous of its Order that Defendant appear "to be deposed under oath for an undetermined period of time to allow Judgment Plaintiffs' attorneys to conduct the deposition of Judgment Defendant concerning all assets, individuals and entities that are set forth on Schedule "A" . . . ."  If Defendant felt, as he now argues, that Plaintiffs were abusing the discovery process, his option was to contact the Court and seek a modification of the Order -- Defendant is well aware of the role the Court plays in moderating discovery disputes. Defendant did not do so and the Court finds him in contempt for ending depositions at will.

**B.   Claims of Spousal Communication Privilege**

Plaintiffs also argue that Defendant was impermissibly unresponsive when he refused to answer questions about conversations with his wife, asserting a marital privilege. Though New Jersey does have a privilege that protects spousal communications in civil proceedings, N.J. Stat. Ann. 2A:84A-22, this action was brought under the federal RICO statute, as well as state common law, and so federal evidentiary rules apply. Fed. R. Evid. 501; <u>Wm. T. Thompson Co. v. General Nutrition Corp.</u>, 671 F.2d 100, 104 (3d Cir. 1982) ("[W]hen there are federal law claims in a case also presenting state law claims,

24

the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule."). Though it is unclear whether the privilege applies in federal civil proceedings involving federal and state claims, at least some courts within this circuit have found that it does. See Knepp v. United Stone Veneer, LLC., No. 06-CV-1018, 2007 WL 2597936, at *4 (W.D. Pa. Sept. 5., 2007) ("We believe that unlike the adverse spousal privilege, but like other communications privileges such as the psychotherapist-patient privilege and the attorney-client privilege, the marital communications privilege applies to civil matters and even applies if the witness or witness's spouse is not a party to the proceeding.") (citing Caplan v. Fellheimer Eichen Braverman & Kaskey, 162 F.R.D. 490, 492 (E.D. Pa. 1995)). Regardless, the Court will not find that Defendant's assertion of such a privilege was contemptuous. Certainly, the proper approach to assert such a privilege would have been to file a motion for a protective order, but Defendant's assertion of this privilege, while appearing pro se, does not constitute contempt for this Court's Order, because the contours of the marital privilege were not clear. For present purposes, the Court will take the opportunity to clarify the scope of the privilege of marital communications.

Federal common law and New Jersey law both recognize a privilege for marital communications. The marital communications

25

privilege prohibits the compelled disclosure, in civil and criminal cases, of confidential communications from one spouse to another.  <u>See</u> Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, 2 Federal Rules of Evidence Manual (9th ed.) ¶ 501.02[8], at p. 501-75 (2006).  The privilege is designed to protect and further marital intimacy as of the time the communication is made between the spouses.  <u>Id.</u>  The privilege protects communications between spouses, not conduct or occurrences; thus, testimony of one spouse about another spouse's acts is not privileged.  <u>United States v. Parker</u>, 834 F.2d 408, 411 (4th Cir. 1987); <u>United States v. Robinson</u>, 763 F.2d 778 (6th Cir. 1985) (wife's testimony concerning her discovery of husband's business documents not privileged); <u>United States v. Lofton</u>, 957 F.2d 476 (7th Cir. 1992) (wife's testimony regarding husband's cocaine use and his receipt of a package in home not privileged); <u>United States v. Espino</u>, 317 F.3d 788 (8th Cir. 2003) (court properly permitted wife's testimony about husband's conduct while precluding testimony about private conversations between them).

The communication must be confidential, that is, outside the presence of a third party and with a reasonable expectation of privacy.  <u>Wolfle v. United States</u>, 291 U.S. 7, 14 (1934) (communication from husband to wife through stenographer is not confidential); <u>United States v. Madoch</u>, 149 F.3d 596 (7th Cir. 1998) (wife's conversation with incarcerated husband, taped on

26

jail's monitoring system, not within reasonable expectation of confidentiality); United States v. Strobehn, 421 F.3d 1017 (9th Cir. 2005) (no expectation of confidentiality in husband's note to wife which was on same pages as his notes to others).

There may be an exception to the privilege when the confidential marital communication was in furtherance of a crime or fraud in which the speaker was a knowing participant, United States v. Estes, 793 F.2d 465 (2d Cir. 1986), United States v. Rakes, 136 F.3d 1 (1st Cir. 1998) (crime/fraud exception requires wrongful complicity by the privilege holder, not innocent or involuntary action), or where the husband and wife are joint participants in criminal activity whether or not each spouse is prosecuted, United States v. Hill, 967 F.2d 902 (3d Cir. 1992).

One spouse may waive the ability to assert the spousal communication privilege on his or her own behalf, where he or she has not asserted the privilege through a timely objection, Morganroth & Morganroth v. DeLorean, 123 F.3d 374 (6th Cir. 1997), United States v. Vo, 413 F.3d 1010 (9th Cir. 2005), or has already testified as to certain confidential communications, United States v. Premises Known as 281 Syosset Woodbury Rd., 71 F.3d 1067 (2d Cir. 1995), but the privilege is held by both spouses, and thus it would be inconsistent to permit the waiver by one spouse (by testimony or failure to assert the privilege) to constitute a waiver of the privilege on behalf of the other

27

spouse, see United States v. Jarvison, 409 F.3d 1221 (10th Cir. 2005), United States v. Montgomery, 384 F.3d 1050, 1059 (9th Cir. 2004), United States v. Porter, 986 F.2d 1014 (6th Cir. 1993).

Under New Jersey law, this privilege is statutory, stating as follows:

> No person shall disclose any communication made in confidence between such person and his or her spouse unless both shall consent to the disclosure or unless the communication is relevant to an issue in an action between them or in a criminal action or proceeding in which either spouse consents to the disclosure, or in a criminal action or proceeding coming within Rule 23(2). When a spouse is incompetent or deceased, consent to the disclosure may be given for such spouse by the guardian, executor or administrator. The requirement for consent shall not terminate with divorce or separation. A communication between spouses while living separate and apart under a divorce from bed and board shall not be a privileged communication.

N.J. Stat. Ann. 2A:84A-22.

First, as can be seen, like its federal common law counterpart, the New Jersey marital communications privilege applies only to communications from one spouse to another made in confidence. The privilege is narrowly construed. "Communications" is given its plain meaning. It does not shield the witness's knowledge of his spouse's whereabouts, occupation, pastimes, and the like, for these facts are not themselves "communications."

Second, the privilege does not shield statements of the spouse that were not made "in confidence." If another person,

28

not within the privilege, has heard the remarks, it is not in confidence and the privilege is lost. For example, "What did your wife say to your mother?" does not elicit a privileged spousal communication made in confidence. State v. Szemple, 640 A.2d 817, 822 (N.J. 1994) ("[T]he involvement of a third party vitiates the requirement of confidentiality. The privilege does not attach to the communication itself, but is personal to the spouses.")

Third, a spousal communication is no longer privileged in a civil proceeding if both spouses consent to disclosure, while consent to disclosure by one spouse suffices in a criminal proceeding, see N.J. Stat. Ann. 2A:84A-22, supra; State v. Szemple, 622 A.2d 248, 250-51 (N.J. Super. Ct. App. Div. 1993) (noting that in same proceeding, consent of both parties no longer required), affirmed 640 A.2d 817 (N.J. 1994) (consent of either spouse in a criminal case waives marital communication privilege). No New Jersey precedent has been found which speaks to the issue of whether disclosure of the marital communication by one spouse in a civil proceeding will result in a waiver, but that proposition is doubtful, given the statutory language. If both spouses have testified about the confidential marital communication in a civil case, however, it would appear that the privilege has been waived by such testimony.

29

In the present civil case, where federal law is the basis of the Court's jurisdiction, the federal common law of privilege of marital communications will apply pursuant to Fed. R. Evid. 501. The parties herein shall be guided accordingly in any future claim of such privilege or litigation of such dispute.

**C.   Appropriate Sanction**

The Court, having found that Defendant should be held in contempt, must determine the appropriate sanction.  This being a post-judgment dispute, the Court is left with limited options as to appropriate sanctions.  For example, entering another award of attorney's fees for the efforts of Plaintiffs' counsel to redress Holloway's discovery misconduct would be meaningless on top of Holloway's current indebtedness to Plaintiffs exceeding nine million dollars.

Plaintiffs ask the Court to hold Defendant in custody until he purges his contempt by responding fully and truthfully in the areas discussed above.  Defendant asks that the Court give him another opportunity to comply, this time with deadlines, and the possibility of incarceration if he again fails to comply. Neither party suggests, nor would it be reasonable given the long and tortured history of post-judgment litigation in this case, to impose monetary sanctions.  The Court finds that Defendant's request for another chance does not amount to a sanction and that the Court's Order of March 5, 2008 was that final chance.  The

30

Court will therefore order Defendant to be arrested and placed in custody until he purges his contempt in the manner which the Court will outline in the accompanying order.  See Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 442 (1911) (imprisoned civil contemnor "carries the keys of his prison in his own pocket").

Though it is true that "district courts have broad discretion to fashion an appropriate civil contempt remedy," where the potential remedy is incarceration, this Court will tread carefully.  Northeast Women's Ctr., Inc. v. McMonagle, 939 F.2d 57, 70 (3d Cir. 1991).  The Court is guided in its determination by the Third Circuit's opinion in Poulis v. State Farm Fire and Cas. Co., 747 F.2d 863, 868 (3d Cir. 1984), where it set forth six factors to consider when dismissing a case as a sanction for misconduct.  The Poulis analysis applies to consideration of sanctions for disobedience to a court's discovery order under Rule 37(b)(2), Fed. R. Civ. P.  See, e.g., Mindek v. Rigatti, 964 F.3d 1369, 1373 (3d Cir. 1992); Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1147-49 (3d Cir. 1990); see also, Robert E. Bartkus & Elizabeth J. Sher, N.J. Federal Civil Procedure (2d ed.), § 12-10, at 437 (2008) ("Regardless of a court's temperament on discovery sanctions, once it orders compliance with the rules, disobedience may be treated as contempt of court.").

31

Though the sanction in question is custody, rather than the dismissal at issue in Poulis, it is similarly "extreme" and demands special care.  The facts of this case, when considered through the relevant Poulis factors, all militate towards the sanction of incarceration.  The Poulis factors are:

> (1) the extent of the party 's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.[14]

Id. at 868 (emphasis removed).

### 1.   Defendant's Personal Responsibility

This first Poulis factor weights strongly in favor of incarceration.  Plaintiff appeared through the discovery disputes and depositions without counsel, instead choosing to proceed pro se.  His conduct at depositions and the content of his testimony was entirely his own, without guidance from an attorney.  Thus the misconduct evident in this case rests entirely on Defendant's shoulders.

---

[14] The sixth factor, the meritoriousness of the claim or defense, requires little comment, other than to note that Plaintiffs succeeded upon their claims against Mr. Holloway, achieving a judgment now valued in excess of nine million dollars, as to which they have gained plenary rights of post-judgment discovery uninhibited by Mr. Holloway's evasiveness, feigned ignorance and misrepresentations of his financial situation, year after year.

2.   <u>Prejudice to Plaintiffs</u>

Prejudice is a key element of the <u>Poulis</u> analysis and is an important measure for the severity of the sanction.  <u>Bowers v. Nat'l Collegiate Athletic Assoc.</u>, 564 F. Supp. 2d 322, 335 (D.N.J. 2008).  "[T]he Court recognizes that the severity of the prejudice caused by the violation should be proportional to the sanction imposed in an effort to cure that prejudice."  <u>Id.</u> Here, as a consequence of Defendant's refusal to provide complete and honest answers to questions about his assets and financial dealings, Plaintiffs have been deprived for almost twelve years of the ability to collect upon a judgment of now over nine million dollars to which they are entitled.  In addition, Plaintiffs have been forced to pay the costs for post-judgment litigation and discovery that spans years and includes numerous depositions, which have thus far proved largely fruitless thanks to Defendant's conduct.  The severity and duration of the prejudice in this case warrants a severe and effective sanction.

3.   <u>History of Dilatoriness</u>

The Court has already described in detail the history of dilatoriness that has led to this point.  <u>See supra</u>, Part I. This Court has held Defendant in contempt before, and yet he remains unimpressed by the Court's authority.  <u>Holloway II</u>, 1996 WL 495148, at *20.  It is worth, however, briefly reiterating the fact that it has been almost twelve years and yet Defendant and

33

Defendant's family have yet to provide a complete and honest depiction of their finances, including the ebbs and flows of millions of dollars of wealth.  As early as September, 2003, this Court found that Defendant was unresponsive to questions about his wife's finances and consequently his own source of financial support.  Holloway III, 2003 U.S. Dist. LEXIS 16961, at *16-17.  Plaintiffs highlight Defendant's delay and then unilateral cancellation of a deposition in November, 2006. (Pls. Exs. H & J.)  Two years later, Defendant once again unilaterally put an end to Court ordered depositions.  Defendant has been consistently unresponsive to post-judgment discovery and has actively delayed its progression.  This misconduct suggests a severe sanction.

### 4.  Willfulness or Bad Faith

The fourth factor calls on the Court to determine whether Defendant's conduct was the product of willfulness or bad faith.

> The Third Circuit has made clear that in the context of discovery sanctions, willfulness and bad faith "involve[ ] intentional or self-serving behavior." [Adams v. Trustees of New Jersey Brewery Employees' Pension Trust Fund, 29 F.3d 863, 875 (3d Cir. 1994)].  By contrast, an attorney's "negligent behavior" or "failure to move with ... dispatch" -- even if "inexcusable" -- will not suffice to establish willfulness or bad faith. Id. (citing Donnelly v. Johns-Manville Sales Corp., 677 F.2d 339, 342 (3d Cir. 1982)).

Bowers, 564 F. Supp. 2d at 340.  In this case, the Court has already found by clear and convincing evidence that Defendant

gave dishonest, evasive and misleading testimony.  It is clear that Defendant's motive throughout post-judgment discovery was to avoid paying the judgment entered against him.  In fact, he testified that he never intended to pay any part of the judgment. (Pls. Ex. B, June 13, 2008 Dep. at 27.)  The Court finds that his conduct was intentional and self-serving such that it was the product of wilfulness and bad faith and justifies the sanction of incarceration until he provides the information that is compelled of him.

###### 5.   Availability of Alternative Sanctions

The final relevant Poulis factor is the availability of other, lesser, sanctions.  Given the posture of this case, the Court sees no other effective sanction for Defendant's misconduct.  Monetary sanctions are quite obviously no remedy for they have no coercive effect upon Mr. Holloway.  Thus, a typical civil contempt sanction imposing a coercive sum for each future day of non-compliance would have no teeth here, after these many years of Defendant's dodging and deflecting in order to prevent Plaintiffs' lawful collection efforts.  Defendant has not offered a reasonable alternative sanction, as the Court has already noted, because simply implementing another discovery order is not a "sanction" and has no remedial properties.  Defendant has already proven that he does not take seriously the power of the Court to enforce his obligations to these Judgment Plaintiffs.

35

In such circumstances, incarceration is the only effective and appropriate sanction left to the Court.

### 6.   Appropriate Sanction

All the Poulis factors point to the same result --  civil confinement is the only appropriate, effective, and proportionate measure addressing Defendant's misconduct to induce compliance with this Court's Order, to continue until such time as he complies with this Court's Order for discovery.  The United States Marshal and Federal Bureau of Prisons will confine Mr. Holloway until such time, if ever, as he purges his contempt.

### 7.   Temporary Stay of Execution of Arrest Warrant

As noted, the Court is signing a warrant for Defendant Gregory Holloway's arrest to begin his civil confinement.  To assure that Defendant's confinement is no longer than necessary to induce and obtain his compliance with this Court's Order, and recognizing that counsel need a short period of time to prepare for reconvening of his deposition pursuant to today's Order, this Court sua sponte will temporarily stay execution of the arrest warrant until March 23, 2009.  Meanwhile, Defendant Holloway will be given the opportunity to self-surrender to the United States Marshal in Camden, New Jersey, to commence his civil confinement not later than Noon, March 23, 2009.  Defense counsel may make arrangements for self-surrender with the United States Marshal's Office.  If Defendant fails to self-surrender, he will be

arrested pursuant to the warrant.

Counsel should confer immediately to establish the date for reconvening the deposition within this Courthouse.  If it is not possible to reconvene within this ten-day period from the entry of this Order, or if Plaintiffs' counsel seeks additional time to obtain the documents and/or signed authorizations for documents compelled by today's Order, prior to reconvening the deposition, then counsel shall so advise and the Court, upon request by either party's counsel,[15] would consider enlarging the temporary stay of execution of the arrest warrant (and the deadline for self-surrender) to accommodate legitimate needs facilitating the compliance with this Court's Orders.

## IV.  CONCLUSION

For the foregoing reasons, the Court will hold Defendant in contempt of the March 5, 2008 Order because he did not obey that Order in various particulars: he intentionally gave evasive and incomplete testimony regarding (1) his source of financial support, (2) his knowledge of his wife's finances and employment, (3) his relationship with Carl Norton, and (4) the existence and whereabouts of any documents beyond the two joint tax returns

---

[15] Any application to enlarge the temporary stay, or to enlarge the date for self-surrender, shall be in writing, filed and served at least two business days before the deadline, showing either (a) consent of counsel, or (b) good cause to believe such enlargement will facilitate achieving compliance with this Court's Orders.  The accompanying Order will so provide.

from 1998 and 1999.  In addition, the Court finds Defendant in contempt (5) for unilaterally cancelling depositions without seek a modification of the Court Order.  The Court further finds that civil confinement is the only appropriate and effective sanction for Defendant's contemptuous conduct and will order his arrest to induce his compliance with this Court's orders.  Defendant is to remain in custody until he provides complete and honest testimony on the subjects listed above in Parts III.A.1 through III.A.4, and attends all future depositions, as stated in Part III.A.5, above, unless and until the Court modifies its Order.

The Court will separately and explicitly order Defendant to provide all requested documents which are in his possession, custody, or control, including documents held by his lawyer, financial institutions, business associates, friends and his family members.  Finally, if Defendant claims a privilege for confidential marital communications, he may only do so consistent with the above determinations of the contours of this privilege under federal common law (as explained in Part III.B., above), and he will have the burden of sustaining such claim of privilege by seeking a protective order.

The accompanying Order will be entered and a warrant will be issued for Defendant's arrest and civil confinement until such time as he purges his contempt.  Finally, this Court will stay execution of the arrest warrant until March 23, 2009 to enable

38

Defendant, through his attorney, to arrange for self-surrender to

the United States Marshal's office in Camden, New Jersey, not

later than Noon, March 23, 2009.


**March 12, 2009**                    **_s/ Jerome B. Simandle_**
Date                                  JEROME B. SIMANDLE
                                      United States District Judge